2015 OK CIV APP 75

**In the Matter of the GUARDIANSHIP OF Tracy Delbert STANFIELD.**

**Loyde H. Warren, Appellant,**

**v.**

**Mildred Stanfield, Guardian of the Estate of Tracy Delbert Stanfield, Appellee.**

**No. 111,615.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Jan. 6, 2015.

sult in automatic suspension from the practice of law until further order of the Court.''

Ronald A. Schaulat, Schaulat Falsetti, PLLC, Oklahoma City, Oklahoma, for Appellant.

Jerry L. Colclazier, Colclazier & Associates, Seminole, Oklahoma, for Appellee.

DEBORAH B. BARNES, Chief Judge.

¶1 Loyde H. Warren (Warren) appeals from the trial court's "Journal Entry" (Judgment) refusing to approve a contingent fee contract executed between himself and Mildred Stanfield, Guardian of the Estate of Tracy Delbert Stanfield (Guardian), for legal services performed by Warren on behalf of Tracy Delbert Stanfield (Ward), and, instead, awarding an attorney's fee in quantum meruit in the amount of 10% of the sum recovered by Ward's estate through settlement. Guardian cross-appeals from the trial court's Judgment awarding the 10% fee. We affirm as modified.

## BACKGROUND

¶ 2 The current appeal is the second appeal concerning Warren's request for approval of a contingent fee contract executed by Guardian on behalf of Ward. The Supreme Court of Oklahoma determined in *In re Guardianship of Stanfield*, 2012 OK 8, 276 P.3d 989,[1] that Warren's failure to secure approval of the contingent fee contract prior to payment under the contract and the mere passage of time between the time of the contract's execution and the request for approval were not, in themselves, legally sufficient reasons for the trial court to fail to approve the contingent fee contract. *Id.* ¶ 28. The Supreme Court reached no conclusion about whether the requested contingent fee should be approved or what compensation should be proper whether the contract were approved or not. *Id.* ¶ 27. The *Stanfield* Court remanded the case to the trial court for determination of "Warren's motion for approval of the contingent fee agreement and the Guardian's claims and defenses...." *Id.*[2]

¶ 3 The trial court conducted a hearing over two days during which it heard testimony from Warren, Ward, Guardian, and two attorneys who testified on behalf of Warren. The court also accepted into evidence numerous documents offered by the parties. The record also contains exhibits attached to various motions filed by the parties.

¶ 4 Appearing as Warren's attorney expert with regard to the reasonableness of the contingent fee contract was James Dawson (Dawson).[3] At the time, Dawson had been practicing law for forty years, the last twenty-five of which focused on civil litigation in federal and state courts.[4] Dawson testified he had experience with and knowledge about

---

1. As explained by the Supreme Court in *Stanfield*:

    [Ward] was injured in 1992. A settlement relating to his injuries resulted in an annuity providing periodic payments to [Ward] from Metropolitan Life Insurance Company (MetLife). In 1996, [Ward, who was represented by other attorneys at that time,] assigned certain annuity payments, and the assignee in turn assigned them to J.G. Wentworth S.S.C. Limited Partnership (Wentworth). [The settlement agreement prohibited Ward from assigning the annuity.] In 1998, [Ward] caused MetLife to ignore the assignments to Wentworth.
    Wentworth responded by filing an action in a Pennsylvania state court, and in May 1998 obtained a judgment against [Ward] for $572,747.05. Wentworth then filed a motion for a judgment against garnishee MetLife for the same amount. The Court of Common Pleas, Philadelphia County, granted the motion in September 1998.
    [Guardian], [Ward's] mother, ... filed a petition in the District Court of Seminole County, Oklahoma, to be appointed guardian of [Ward's] estate. She was appointed guardian in March 1999. In March 2001, MetLife filed an interpleader action in the United States District Court for the Eastern District of Pennsylvania and named as defendants Wentworth and [Guardian] in her capacity as guardian of [Ward's] estate. [Guardian] asked [Warren] to accept service of process on her behalf, and he agreed. The judge in the federal case ordered a settlement conference. In May 2001, [Guardian] signed Warren's contingency fee agreement that provided a legal fee of 33% of the gross recovery after legal costs were deducted, and if a hearing or trial was necessary, a fee of 40%

    of the gross recovery after legal costs were deducted.
    *Id.* ¶¶ 2–4 (footnote omitted).

2. As stated by the Supreme Court:

    In 2009, Warren filed a motion in the open and continuing guardianship case before the District Court of Seminole County for court approval of both the 2001 contract for legal representation and the payment of legal fees made pursuant to that contract. Guardian objected and argued that: (1) A contingency fee for successfully defending a client from a judgment was improper, and Warren's motion in this case was similar to a lawyer obtaining a contingency fee for successfully defending a client in a residential mortgage foreclosure proceeding and requesting 40% of the residence as a fee; (2) Guardian had been paying Warren based upon an hourly billing method, and Warren had improperly induced Guardian to sign the contingency fee agreement; (3) The fee agreement was unenforceable because it had not been approved by the guardianship court; and (4) The motion should be denied because of breach of contract, fraud, breach of a fiduciary duty, and negligence.
    *Id.* ¶ 6.

3. Dawson is a partner in the Oklahoma City law firm Miller Dollarhide.

4. Dawson executed an affidavit on April 12, 2007, regarding his review of Warren's file of the MetLife case and the companion state case and testified the statements he made in the affidavit were still accurate. August 29, 2012 Tr. at 44; R. at 87, Exhibit T.

federal court practice in Pennsylvania,[5] and had served for several years on the Oklahoma Bar Association Professional Responsibility Tribunal and the Oklahoma County Bar Association ethics and fee grievance committee. Dawson said he reviewed Warren's pleadings and correspondence file concerning the MetLife interpleader case. He testified the case was risky, and "[c]ould have involved a lot of work in a foreign state and come up with nothing." He testified the contingency fee is appropriate in cases where the client cannot afford to pay an hourly rate, and based on his review of the file, Ward's estate did not have "any money" or other assets. In his opinion, even in the absence of a graduated fee, the 40% contingency would have been reasonable.

¶ 5 On cross-examination, Dawson agreed that it would be the attorney's responsibility to have the court approve his fee contract and agreed he would seek that approval as quickly as possible. However, on redirect, he testified that if the guardian had an attorney, that attorney should seek approval of the contract. Dawson also stated that had Warren not done the work he did on Ward's behalf, MetLife "would have paid [the money] to Wentworth."[6]

¶ 6 The trial court questioned Dawson about the "timing" of the contingency fee contract because it appeared Warren was already representing Ward when the contingency fee agreement was executed with Guardian. Dawson testified that a contingent fee agreement could be executed as the first fee agreement or it might arise later even if the client was initially represented for an hourly fee; however, he could not say what occurred in this case. On re-cross, Dawson testified that an attorney is not ethically required to recommend that his client seek independent representation on "midstream" contracts—contracts that switch from an hourly rate to a contingency fee during the representation—though he agreed a client could do so, and testified that such contracts are not presumptively fraudulent.

¶ 7 Warren, who has practiced law for over 40 years and had been in private practice for 38 years at the time of the hearing, testified that Ward first sought his representation in June of 1998 concerning a collection matter. Warren testified about the work he did on Ward's behalf beginning in 1998 and during 1999 after Ward made Warren aware of the May 1998 Wentworth judgment against Ward from a Pennsylvania state court. Warren testified he did not charge a fee to Ward for that work though he stated he read the May 1998 Wentworth judgment, wrote a letter to MetLife and spoke to a MetLife representative by phone at least once, contacted three attorneys in Pennsylvania about their willingness to represent Ward in the Wentworth garnishment case, contacted a physician to evaluate Ward, and sent information to the attorney Guardian secured to establish the guardianship.[7] Warren also testified about the circumstances concerning execution of the contingent fee contract with Guardian and the work he did in the MetLife case after he accepted service on behalf of Guardian in March 2001.[8]

---

5. The witness has had two or three cases in Pennsylvania, in federal and state court, and characterized Pennsylvania's court procedures as "very complicated; very archaic," and thus declined to say he was familiar with those procedures.

6. Guardian's attorney further cross-examined Dawson about the nature of MetLife's federal interpleader case, and posed a hypothetical scenario wherein MetLife did all of the work and did not need Warren's work to reach the settlement that was, in fact, reached. The witness said if a contingency contract was in place, theoretically, Warren could still recover a fee, though he testified practically that might not be the result. However, on redirect, the witness testified that prior to the guardianship, a state gar-

nishment action filed by Wentworth against Ward and MetLife resulted in an order to MetLife to pay the state judgment to Wentworth. Subsequently, the guardianship was established. Petitioner's Exhibit 8. Dawson testified that after the guardianship was filed, MetLife then filed the federal court interpleader because the guardianship put into doubt the Pennsylvania garnishment ruling.

7. August 29, 2012 Tr. at 103–105, 107, 177–78.

8. Warren's testimony and other testimony and evidence concerning the work undertaken by Warren beginning in August 1998 and again beginning in March 2001 are more fully discussed later in this Opinion.

¶8 As to the work he did in preparation for the settlement conference on which Warren based his claim for the 40% fee, Warren testified he understood (from Pennsylvania local counsel Warren hired until he was admitted pro hac vice)[9] that the federal judge conducting the settlement conference was "very strict" and that Warren had "better be ready for trial when" he got to Pennsylvania. Therefore, Warren had "everything ready as far as what my witnesses are going to testify to, what law I was going to be relying on and just like a regular trial before the judge. And that is the way I prepared it." Warren traveled to Pennsylvania to attend the settlement conference, presented his summary of the witnesses' testimony, made his legal arguments, and gave a closing argument, as had Wentworth and MetLife. Warren said the judge then told the parties he thought they should try to settle the case though he gave no indication about the specifics of any such settlement. The parties then met and, later that evening, settled the case.

¶9 Warren further testified about the nature of the MetLife settlement conference as a "hearing" on cross-examination. Warren testified that if he had to attend a hearing on a motion to dismiss, for example, that would not be the type of hearing that would entitle him to the 40% fee, but instead to the base fee of one-third. He also stated that his attendance at a motion for summary judgment in which evidence and argument would be presented would likewise not entitle him to 40% under the contingency fee contract. He testified settlement conferences would also not be a hearing within the terms of the contract except the one he attended because the judge conducted the settlement conference, and Warren presented a summary of his witnesses' testimony and made legal arguments.[10]

¶10 Throughout August of 2001, letters among the attorneys were exchanged in an effort to produce a settlement agreement to be presented to the federal court.[11] The court entered its order on September 4, 2001. In the final settlement, Ward's estate owed Wentworth the amount of money it originally gave to him for the assignments of his annuity, plus interest, less amounts Wentworth already received. Warren testified Ward's estate saved over $400,000 through the settlement.[12] Warren admitted the case settled for the amount he asked in a settlement offer to Wentworth made just prior to the settlement conference.

¶11 Warren also introduced two exhibits prepared by Guardian or Ward. According to Warren, Guardian said Petitioner's Exhibit 14 was a handwritten schedule depicting "how [Ward] wanted to divide the funds," but Guardian said they could discuss the schedule Ward proposed when Guardian and

9. Warren hired local counsel to file pleadings and other matters drafted by Warren. August 29, 2012 Tr. at 127.

10. August 29, 2012 Tr. at 217, 222.

11. August 29, 2012 Tr. at 148.

12. Warren also testified he believed if the case had not settled but proceeded to trial, Ward would have likely had Wentworth's judgment enforced against him because his settlement agreement was to be interpreted under Oklahoma law. He testified that less than two months after the settlement order was entered, the Oklahoma Supreme Court issued its Opinion in *In re Kaufman*, 2001 OK 88, 37 P.3d 845. In *Kaufman*, the Supreme Court answered two questions certified to it by the United States Bankruptcy Court for the Western District of Oklahoma, in a case in which Wentworth was also a creditor. In that case, in 1999 Kaufman sold an annuity he received through a structured settlement to Wentworth. Kaufman's settlement agreement prohibited the sale of the annuity and also provided that it would be interpreted under Oklahoma law. *Id.* ¶2. The Supreme Court stated the bankruptcy court was prompted to certify the questions because Wentworth sought permission to seize the contracted-for annuity payments in Kaufman's Chapter 13 bankruptcy action and Kaufman claimed the purchase agreement was invalid because of the anti-assignment provisions of the settlement agreement.

In finding that the Structured Settlement Protection Act of 2001 was enacted after the purchase agreement between Wentworth and Kaufman, the Court held:

In Oklahoma, an assignor cannot maintain the inequitable position of asserting, as against its assignee, nonassignability. Based on this well-settled legal principle, we determine that an assignor of a contract containing a valid anti-assignment provision may not invoke the clause as against its assignee.

*Id.* ¶21 (footnote omitted). Ward's assignments of his annuity and Wentworth's Pennsylvania judgment occurred prior to 2001.

Warren met. Warren also introduced an agreement signed by Guardian about how the proceeds of the settlement were going to be paid. Warren testified that Ward wanted a loan in the amount of $4,400 paid from the proceeds, and that Warren wrote a check for that amount, though he did not know the particulars of the loan only that Ward said it needed to be paid. Warren also paid the Pennsylvania local counsel an attorney fee based on an hourly rate in the amount of $2,500.

¶ 12 From late 2001 until about mid–2005, Warren was paid according to the agreed upon payment schedule. However, in May 2005 the payments to Wentworth under the terms of the settlement agreement ended but MetLife's payments to Warren did not reflect the change. The matter was corrected, but by the time it was, Guardian hired her present attorney who sued Warren in a different lawsuit for, among other matters, malpractice and fraud.

¶ 13 Warren said he did not keep any time records in the MetLife case because it was a contingency fee case and admitted he had no documented record of the hours he spent on the case.

¶ 14 The court also heard testimony from Ward and Guardian. They testified that Warren's method of payment for legal fees, prior to the contingent fee contract, was to call them whenever he needed money and that they paid him in cash but did not receive receipts or information about the legal services for which the payments were made. Both claimed they did not understand what a contingent fee contract was. They both testified Warren failed to advise them to seek another lawyer's advice about a switch from an hourly or flat rate to a contingency fee contract and failed to tell them about a federal district court case favorable to Ward, that the MetLife case was set for settlement conference or what a settlement conference was, and that local counsel in Pennsylvania had been hired at the time the contingency fee contract was signed. They claimed they knew nothing about the terms of the settle-

ment agreement until after Warren returned from Pennsylvania.

¶ 15 Ward claimed Warren was representing him on the Pennsylvania lawsuit from the time Ward hired Warren to represent him in several collection and foreclosure cases; consequently, Ward testified he believed Warren was responsible for Wentworth's judgment against him.

¶ 16 Ward further testified that after the MetLife settlement was reached, he prepared a document setting out how the monthly annuity payments would be divided to pay Warren's fee and Ward.[13] Wentworth was paid $1,500 from the monthly annuity; the remaining $1,500 was divided between Ward's estate and Warren, $700 and $800, respectively. The document also reflected a $4,400 debt Ward claimed he owed to several people for money he borrowed to pay Warren for representing him in the MetLife case and which needed to be repaid. Ward stated that each month, Guardian went to Warren's office to sign the annuity check and she received a $700 check and Warren received $800. However, when Wentworth's claim was paid, the annuity check sent to Warren on behalf of Ward was to increase to $2,300, then eventually stair-step to higher amounts, but Warren was still only to receive $800 per month.[14] Ward testified that when the check for $2,300 came in, Warren gave Guardian $700 and kept the remaining funds. He claimed Warren only said he would inquire into the matter after Guardian questioned him about the annuity amount.

¶ 17 On cross-examination, however, Ward testified that at the time Warren represented him on the collection and foreclosure actions, the only other matter he brought to Warren was the MetLife interpleader and that he was sure all four were at the same time. Ward could not remember the dates he first consulted Warren about the foreclosure and collections cases though he claimed he saw Warren before he had been served in those cases. When asked whether he has "memory issues," Ward stated, "Sometimes I do;

---

13. September 4, 2012 Tr. at 30; Guardian's Exhibit 7.

14. On cross-examination, however, Ward also admitted he signed an agreement in which Warren was to receive certain lump sum payments.

sometimes I don't." In answer to the question, "You have memory issues where you really can't remember dates or occurrences; isn't that correct, sir?" Ward replied, "It all depends on which way you are looking at it. . . . If I am looking at a piece of paper, I get sued, I usually take that piece of paper to an attorney." Ward further testified, "I can remember things. It might not be totally specific to an exact date." In later testimony, however, Ward then denied that MetLife ever filed a lawsuit against him or his guardianship estate, and claimed he was unaware of any such lawsuit, and was only aware of the Wentworth lawsuit.

¶ 18 Guardian testified she first consulted Warren in March of 1999 for a bankruptcy matter concerning credit cards. She said the first time she went with Ward to Warren's office was in January 2001 concerning Ward's "annuity, Pennsylvania thing." She testified that early in 2001 Warren suggested a guardianship be established for Ward and she agreed to be the guardian. Reminded that the guardianship for Ward was established in March 1999, Guardian could not remember if she spoke to Warren before or after she was appointed Ward's guardian.

¶ 19 Although she could not recall dates, Guardian said she spoke to Warren a few times and met with him "about the Pennsylvania lawsuit." What she recalled was that Warren said she needed to give him $10,000 to hire a lawyer in Pennsylvania "to represent us, [Ward]." She told Warren she could only secure $4,000, but he told her to come to his office and that he had "a paper that we may work out, you know, for the rest of it." She testified he showed her the paper and said he could not represent her unless she signed it. She testified she signed the contingency fee contract because Warren knew all about the case and that it was a late date to get another lawyer; she claimed she knew no other lawyers. She also testified on cross-examination that she never read the contract.

¶ 20 Guardian admitted she knew very little about the work Warren did before and after he went to the settlement conference. She testified she did not think he did "that

much," but admitted she did not know. She claimed she did not know if Warren settled the case because other lawyers were there, too. She agreed there were many legal matters occurring in the MetLife case that she "flat [didn't] understand," and enough complication in the case that she did not fully understand everything. She maintained, however, she did not know what was occurring in the case because Warren did not tell her.

¶ 21 Guardian admitted on cross-examination that she signed Petitioner's Exhibit 15, a document setting out the amount of money Warren would be paid each month for his attorney fee. She stated the division prepared by Ward in Petitioner's Exhibit 14, and represented in Petitioner's Exhibit 15, was a fair calculation and division of the settlement. She testified she was satisfied with the settlement in 2001 through the first half of 2005, but claimed she was concerned before MetLife made a mistake on the check amount because she never saw the front of the checks she was signing and did not know if other checks had a higher amount on them. She admitted, however, that she chose to not turn over the checks to verify their amounts. It was after the MetLife mistake that she hired her present attorney.

¶ 22 On January 28, 2013, the trial court filed a "Court Minute Order" in which it set out extensive findings of fact and conclusions of law. On March 1, 2013, the trial court issued its Judgment denying Warren's motion to approve the representation contract and to set fees for the reasons set forth in its January 28 court minute order. The trial court, however, awarded Warren costs and determined an attorney's fee in quantum meruit "[a]fter reviewing all of the evidence, and considering the relevant factors set out in the case law[.]" [15] The trial court ordered that Warren "should be approved an attorney fee equal to 10% of the savings to [Ward's] estate, which is $41,846.82," and ordered approval of an attorney's fee from Ward's estate in that amount. It is from this Judgment that Warren appeals and from

15. R. at 237, ¶ 28.

which Guardian appeals the award of an attorney's fee.

## STANDARD OF REVIEW

¶ 23 The trial court is granted broad, equitable powers to review a contingent fee contract executed by a guardian on behalf of a ward. *In re Guardianship of Stanfield*, 2012 OK 8, ¶ 19, 276 P.3d 989. In actions of equitable cognizance, the judgment made by the trial court will be reversed if it is clearly contrary to the weight of the evidence or contrary to accepted principles of equity or rules of law. *In re Estate of Eversole*, 1994 OK 114, ¶ 7, 885 P.2d 657. "A reviewing court will not disturb a trial court's equity decision absent abused discretion or a finding that it is clearly contrary to the weight of the evidence." *Hedges v. Hedges*, 2002 OK 92, ¶ 10 n. 27, 66 P.3d 364 (citations omitted). "An abuse of discretion occurs when a decision is based on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." *Spencer v. Okla. Gas & Elec. Co.*, 2007 OK 76, ¶ 13, 171 P.3d 890 (footnote omitted) (emphasis omitted).

## ANALYSIS

¶ 24 Warren argues the trial court abused its discretion in not approving the contract,[16] and argues Guardian is estopped from contesting the contract because she approved it and paid Warren under its terms for nearly five years. Guardian filed a counter-petition in error wherein she asserts the following issues on appeal: whether the trial court erred in awarding any attorney fee in the absence of billing records, and whether the trial court erred in awarding a quantum meruit fee without a request from Warren. These issues also rest on the abuse of discretion standard of review.

### I. Disapproval of the 40% Contingent Fee

¶ 25 The trial court correctly found that in *Stanfield*, the Oklahoma Supreme Court directed the trial court to two other cases "that serve as examples [of] where court approval of a contingent fee agreement involving a minor need not occur contemporaneously with the date the agreement is made." 2012 OK 8, ¶ 25, 276 P.3d 989. Those cases, *Abel v. Tisdale*, 1980 OK 161, 619 P.2d 608 (*Abel*), and *Sneed v. Sneed*, 1984 OK 22, 681 P.2d 754, set forth factors trial courts should consider in determining the reasonableness of a contingent fee arrangement involving minors. Both of those cases, and *Abel v. Tisdale*, 1983 OK 109, 673 P.2d 836 (*Abel II*),[17] were decided after *State ex rel. Burk v. City of Oklahoma City*, 1979 OK 115, 598 P.2d 659. In the instant case, the trial court found, in part, it could not approve the contingency contract because Warren had not met his burden of producing

16. Four of Warren's five propositions concern whether the district court abused its discretion in failing to approve the contract. He claims in propositions one and three the trial court's determinations that the contract terms and amount of fees were unreasonable were without evidentiary support; he claims in proposition four that the trial court's determination that the settlement conference was not a hearing as contemplated by the contract was not supported by the evidence; and he claims in proposition five that the trial court's award of a 10% fee is unsupported by any evidence.

17. In *Abel II*, the Supreme Court stated "[a]n award of attorney fees should be based on the factors enumerated in" what is now Rule 1.5 of the Rules of Professional Conduct, 5 O.S.2011, ch. 1, app. 3–A. *Abel II*, ¶ 8. Rule 1.5(a) provides, as follows:

(a). A lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

detailed time records, citing *Abel, Sneed, Burk,* and *Morgan v. Galilean Health Enterprises, Inc.,* 1998 OK 130, 977 P.2d 357.

¶ 26 Guardian argues the trial court's refusal to approve the contingent fee contract is correct because, as the trial court found, Warren failed to produce time records in conjunction with his representation of Guardian in the MetLife interpleader case and failed to produce any evidence regarding the customary rate or a reasonable hourly rate for such services. Guardian thus contends the lodestar method of computing a reasonable attorney's fee makes "time and labor" the foundation of the reasonable fee analysis.[18] Warren, however, argues, in effect, that "time and labor" are but one factor in the multi-factor analysis set forth in Rule 1.5 and, while a mandatory first step in ascertaining reasonable attorney fees in prevailing party situations, "time and labor" should not be the pivotal consideration in determining the reasonableness of a contingent fee contract executed on behalf of a ward.

¶ 27 Although one of the reasons the trial court refused to approve the 40% contingent fee was Warren's failure to produce time records, the court also refused to approve the contract because it found the fee was excessive and, thus, unreasonable. Because we find the evidence supports the trial court's determination that the 40% fee was excessive, we will not address the parties' arguments concerning whether *Burk* controls approval of contingent fee contracts in guardianship proceedings.[19]

¶ 28 In *Stanfield,* part of the Supreme Court's reasoning in requiring court approval of contingent fee contracts between a guardian, on behalf of a ward, and an attorney concerned the duty of courts to protect wards, including minors and adults such as Ward in the present case, from unreasonable attorney fees. 2012 OK 8, ¶ 20, 276 P.3d 989. In addressing the "timing" of Warren's motion for approval of the contingent fee, the Supreme Court discussed cases concerning minors. The Court explained that *Abel* was an example of a "trial court's role in determining the proper amount for a contingent fee contract involving minors" even though "that determination occurred *after* a jury trial, appeal, and settlement." *Id.* ¶ 25. Consequently, the Court held that Warren's failure to seek approval prior to payment of his fee, instead seeking such approval some eight years after the contract was executed, were not in themselves legally sufficient reasons to not approve the contingent fee. *Id.* ¶ 28.

¶ 29 The Supreme Court also stated that in *Abel,*

> We discussed the procedure for the trial court upon remand and, for example, we approvingly discussed (1) the use of "hindsight" by the trial court, (2) when a fee was based on a percentage the court should decrease the amount of the fee as the recovery increased, and (3) that the trial court "should not attempt solely to assess the reasonableness of a contingent fee agreement at the time it was entered into."

*Stanfield,* ¶ 25 (footnote omitted).[20]

¶ 30 In *Abel II,* the Supreme Court shed greater light on the procedures to be used in determining the reasonableness of attorney fees. On remand in *Abel,* the trial court held an evidentiary hearing, at the conclusion of which, it awarded the attorneys less than the one-third contingency fee sought, and the attorneys again appealed. In *Abel II,* the attorneys argued, and the Supreme Court agreed, the clients presented no evidence to support the setting of the fee at less than the one-third requested. The Court noted the

---

18. That is, the number of hours the attorney reasonably expended times a reasonable or customary hourly rate.

19. Similarly, we need not address the trial court's additional reason for refusing to approve the contingent fee contract; that is, that the terms of the agreement were not reasonable.

20. In *Abel,* the Supreme Court noted the record reference to "the work done and its quality," but

found an absence of evidence upon which the trial court could have based its decision to reduce the attorney's contingent fee and thus remanded the case for an evidentiary hearing stating: "While the trial court has the authority to reduce a child's attorney fee, such reduction must be supported by evidence; it cannot be arbitrary and must be the result of an adversary hearing." 1980 OK 161, ¶¶ 23, 24, 619 P.2d 608.

testimony of practicing attorneys who were of the opinion that the attorneys were at least entitled to the one-third fee. The Court also specifically noted that no evidence was presented "to show that the requested fee was too large, or to support the trial court's fee reduction." 1983 OK 109, ¶ 7, 673 P.2d 836. Instead, "[t]he thrust of the Tisdales' evidence was an attack on the value of the approved settlement."

¶ 31 In determining that an attorney fee award should be based on what is now Rule 1.5, the *Abel II* Court noted the rule's list of *variables* that serve "to guide a court in fixing a reasonable attorney fee." *Id.* ¶ 8. The Court stated the attorneys

> presented evidence bearing on factors 1, 3, 4, 7 and 8. The Tisdales presented little or no evidence pertaining to any of these variables. Without objective evidence upon which the trial court could support its fee reduction, the court entered "the realm of speculation and guesswork" we denounced in [*Burk*]. We order the trial court to enforce the contingency fee contract.

*Id.*

¶ 32 In *Stanfield*, the Supreme Court also referenced *Sneed*, 1984 OK 22, 681 P.2d 754, stating that there the Court also "discussed several factors for the trial court to consider regarding a contingent fee contract previously executed by a guardian ad litem on behalf of a minor." *Stanfield*, ¶ 25 (footnote omitted). In *Sneed*, "[c]ertiorari [was] granted for the limited purpose of deciding whether a contingent fee contract executed by the parents of a minor is binding on the minor after she attains majority, reaps the benefit of the representation, and then, attempts to repudiate the contract." *Sneed*, ¶ 1. The trial court denied any attorney's fee to the attorneys who had been hired by the parents. On appeal, the Court of Civil Appeals affirmed the denial of any fee to one of the attorneys, but remanded the cause to award compensation to the other attorney because, on appeal, the minor acknowledged nine hours of work by that attorney inured to her benefit. On certiorari, the attorneys argued, and the Supreme Court agreed, the trial court abused its discretion in refusing to award any attorney fees.

¶ 33 The Court explained:

> Cases involving minors impose a duty upon the trial court to protect the child's interest. The next friend [or guardian ad litem] has the power to employ and select counsel, but the amount of attorney's fees is determined by the trial court, *after consideration of all the attendant circumstances*. The trial court had jurisdiction to examine the contingent fee contract, and to set a reasonable fee. The record reflects that under the circumstances a just compromise and settlement was effected by the efforts of the attorneys.... The judgment of the trial court which denied the attorneys' fee pursuant to the contingent fee contract is tantamount to a conclusion that [the minor] received no benefit from the service of the attorneys. In *Abel v. Tisdale*, [1980 OK 161, ¶ 24,] 619 P.2d 608 ..., this Court held that a trial court has the authority to reduce attorney's fees contracted by the parent on a contingent fee basis, *if the reduction is supported by the evidence*.

*Sneed*, ¶ 4 (footnotes omitted) (emphasis added).

¶ 34 The common thread among *Abel, Abel II*, and *Sneed* is the fairness to the ward, judged in hindsight, in light of all the attendant circumstances and with consideration of the factors set out in Rule 1.5 and the analogous twelve factors set out in *Burk*. The trial court found Warren failed to present evidence of "awards in similar cases or the time and labor required,"[21] and failed to produce evidence of the number of hours he devoted to Ward's case, and failed to produce "evidence of hourly rates."[22] However, the trial court findings clearly state Warren presented evidence bearing on factors 1,[23] 3, 4, 6,

---

21. R. at 236, ¶ 24.

22. R. at 235, ¶ 20.

23. While there were no timesheets submitted or hours presented of the work Warren undertook, the trial court found Warren spent several months working on the MetLife interpleader case

and 8 of Rule 1.5. Evidence bearing on factor 7 is also in the record though not in the trial court's findings of fact.[24]

¶ 35 In exercising its equitable powers, however, the trial court also found a 40% percent contingency fee was "excessive based on the evidence." The trial court based its conclusion on the fact that no discovery had been undertaken, no pretrial or evidentiary hearings were undertaken, and the case was settled on the first court appearance. The trial court had evidence—though conflicting—from which it could determine that the settlement conference, while requiring work not ordinarily required in settlement conferences in Oklahoma, was not the equivalent of a hearing. For example, Warren testified that he would not consider a motion for summary judgment to be the equivalent of a hearing though the evidentiary materials in support of and in defense of such a motion can be extensive. Warren characterized the settlement conference as a "mini-trial" because under the Pennsylvania federal court rules the trial judge hearing the case was present and the parties had to report their deliberations to the judge at the conclusion of the conference. However, he also testified that no witnesses testified or were examined. Rather, the evidence upon which the parties relied was summarized.

¶ 36 In contrast to the lack of evidence in *Abel II*, here there was evidence demonstrating the requested 40% fee "was too large" and supporting the trial court's reduction. *Abel II*, ¶ 7. Consequently, we conclude the trial court's determination that the 40% contingent fee was excessive under the facts of this case was not clearly erroneous; therefore, the trial court did not abuse its discretion in refusing to approve the contingent fee contract.[25]

## II. Quantum Meruit as the Measure for Determining the Value of the Services Rendered

■■■■ ¶ 37 Guardian argues the trial court erred in awarding Warren any fee. While, as Guardian argues, Warren maintained the position that the value of his services under the contingent fee contract was 40%, we do not agree with Guardian's conclusion that no evidence was presented at the two-day hearing concerning the value of the legal services Warren rendered on behalf of Ward. Further, all of the precedent Guardian offers in support of her argument that the trial court was without authority to award any fee to Warren concern the award of attorney fees in prevailing party cases, not the circumstance as in the present case where the fee in dispute is between the attorney and his client. In other situations involving such a dispute, quantum meruit was the measure used for determining the value of the services rendered.

¶ 38 For example, in *First National Bank & Trust Co. v. Bassett*, 1938 OK 461, 183 Okla. 592, 83 P.2d 837,[26] an attorney, who had a contingent fee agreement with a guardian for an incompetent ward, was discharged prior to the occurrence of the contingency. The guardian in that case argued any recovery the attorney "could have recovered would have been on the basis of quantum meruit for services actually performed. Hence, his cause of action accrued at the time he was displaced as attorney for the incompetent ward," a time which was "more than five years prior to the time of filing his action, [therefore] the bar of the statute of limitation has fallen on any claim he might have." *Id.* ¶ 20. The Supreme Court stated that while breach of contract is the basis for the attorney's claim, "quantum meruit enter[s] as the measure for determining the

---

and the issues were novel and difficult. R. at 232, ¶ 6, and 236, ¶ 24.

**24.** Warren testified to his years in practice and his areas of practice. He also introduced an unsolicited letter from an attorney who represented Wentworth in which the opposing counsel referred to Warren as an "excellent lawyer" and praised Warren's efforts and the results he reached on behalf of Ward. R. at 138, Exhibit U.

**25.** R. at 235–36, ¶ 22.

**26.** In its analysis of the need for court approval of contingent fee contracts in guardianship proceedings, *Stanfield* discussed *Bassett* for the proposition that "a guardian can bind the estate of a minor, with approval of the proper court, when such services are necessary and beneficial to the estate." *Stanfield*, ¶ 13 n. 15.

value of the services rendered, and not in itself providing the basis of recovery." *Id.* ¶ 24. The Court stated, "Attorney's fees for services rendered under contingent fee contract before [an attorney's] discharge by [a client] should not be fixed until [the client's] damages are determined, though compensation is determinable on quantum meruit basis." *Id.* ¶ 22 (quoting *Shattuck v. Pennsylvania R.R. Co.*, 48 F.2d 346 (W.D.N.Y.1931)). The Oklahoma Supreme Court explained:

> The basis for this holding being that the value of an attorney's services is not solely controlled by details of his services, but his skill, diligence, and the final results in the litigation are elements bearing upon the appraisement of his employment. Although the value of what he did must be based upon quantum meruit, the ultimate result of the action constitutes an element in fixing the fee. Accordingly, the demand for fixing the value of services ahead of settlement is believed to be unreasonable.

*Bassett*, ¶ 23. *See also Self & Assocs., Inc. v. Jackson*, 2011 OK CIV APP 126, ¶¶ 13–16, 269 P.3d 30, and cases discussed therein.

■ ¶ 39 The circumstances in the present case are different from those in *Bassett* because here, unlike the facts there, the contingency had been met—settlement had been reached with a favorable outcome for Ward's estate—and Warren had not been discharged. However, because the contingent fee contract in a guardianship proceeding can be, and in this case was, disapproved by the court after that result was obtained, we find *Bassett* instructive in determining that quantum meruit is the proper measure for fixing the value of Warren's services. Further, the *Bassett* Court's determination that among the elements to be considered in determining the value of the attorney's services—the attorney's skill and diligence, and the final results of the litigation, not just the "details of his service"—are among the Rule 1.5 variables discussed by the *Stanfield* Court in assessing the reasonableness of an attorney's fee in guardianship proceedings. *Stanfield* also makes clear a trial court has the power in equity to reduce an attorney's fee con-

tracted by a guardian on behalf of a ward. As noted by the trial court, however, a ward is not entitled to free legal services.[27] *Cf. Sneed*, ¶ 4 (Wherein the Supreme Court stated *Abel* does not stand for the proposition that the minor ward was entitled to free legal services even if an attorney's fee provided in a contingent fee contract executed on the minor's behalf was disapproved by the court).

■ ¶ 40 Consequently, we conclude the trial court was acting within its equitable powers in using quantum meruit as the measure for determining the value of the services rendered by Warren on behalf of Ward. We disagree, however, with the conclusion the trial court reached about what that value was in light of the trial court's express findings and the attendant circumstances in this case as presented in the record on appeal. The award of an attorney's fee to Warren in this case is anchored in equity. The Oklahoma Supreme Court has stated: "If the record is sufficient, this court will—in an appeal from an equity—suit decision—render that decree which the chancellor should have entered." *Larman v. Larman*, 1999 OK 83, ¶ 18, 991 P.2d 536 (footnote omitted). However, "[w]hen reviewing an equity suit, an appellate court cannot exercise first-instance cognizance by making original findings of fact. Whenever necessary findings are absent, the cause must be remanded with directions that they be made." *Id.* (footnote omitted).

¶ 41 With respect to the period of time during which Warren was involved in matters pertaining to MetLife and Wentworth's claims, the trial court found Warren was representing Ward as early as August 31, 1998, in the aftermath of Wentworth's May 27, 1998 Pennsylvania state court judgment against Ward.[28] Warren testified he first began representing Ward in a collection matter beginning in June 1998, and that sometime in August 1998—when Warren was representing Ward in a foreclosure action—Ward made Warren aware of Wentworth's May 1998 Pennsylvania judgment. According to the record, Wentworth then filed a garnish-

27. R. at 236, ¶ 26.

28. R. at 232, ¶¶ 5–6.

ment against MetLife; a Pennsylvania court order granting Wentworth's motion was entered on September 8, 1998.[29]

¶ 42 The trial court had before it Warren's denial that he represented Ward in any matter at the time Wentworth secured its Pennsylvania judgment against Ward. Warren also admitted that in August 1998 he wrote a letter to MetLife in which he stated he thought Wentworth's case had jurisdictional issues because the Philadelphia Court of Common Pleas did not have "jurisdiction over [his] client, [Ward]." However, he further testified he stated in the letter that "[w]hen an attorney is employed, I will advise or have that person contact you." He also asked MetLife to keep him "advise[d] if anything occurs concerning the garnishment against" MetLife. Warren testified he contacted MetLife because the garnishment action by Wentworth was against it, and Warren informed MetLife that he was attempting to secure counsel for Ward. Warren told Ward he would attempt to find Pennsylvania counsel for Ward because Warren could not practice law in Pennsylvania.

¶ 43 The court also heard Warren's testimony that in early September 1998, he contacted three Pennsylvania lawyers, but each declined to accept Ward's case.[30] The lawyers, Warren testified, told him they declined because a judgment had already been taken against Ward so they "probably couldn't do any good for him." He said he also contacted an Oklahoma bankruptcy lawyer in October 1998 to see if Ward could bankrupt the judgment. That lawyer also declined to represent Ward.

¶ 44 The trial court also found that "[i]n early 1999, [Warren] encouraged Ward to have a guardian appointed for him in order to assist in vacating the Pennsylvania judgment."[31] Warren testified that in early 1999 he recommended to Guardian and Ward that they hire an attorney to establish a guardianship for Ward because Warren "thought the only defense we would have on [Wentworth's

judgment] would be incompetency." Warren also testified that, after a discussion with Ward, he set an appointment for Ward with the physician who had originally examined Ward after his 1992 accident. Warren testified he hoped that if the physician determined Ward was incompetent to handle his financial affairs, then Ward would be able to show he was incompetent to assign his annuity. The record contains the physician's report in which he stated Ward was not competent to handle his financial affairs.

¶ 45 The trial court found the guardianship was established in March 1999. The record reflects another attorney was hired by Guardian as the guardianship attorney. Warren testified he sent the guardianship attorney the September 1998 garnishment order and correspondence Warren received from MetLife. Warren also notified MetLife that a guardianship was being pursued for Ward.

¶ 46 Despite the guardianship and the physician's report, Warren testified he believed the competency defense in the MetLife case would still be difficult because Wentworth's judgment had already been secured and had never been appealed, and Ward was represented by counsel both times he assigned his annuity. Warren stated he knew he would need a video deposition, at least, of the physician as well as the appearance of other witnesses in Pennsylvania. He also thought he could encounter difficulty because the date the guardianship was established in March 1999 and the dates Ward assigned his annuity having occurred three years earlier in 1996.

¶ 47 While the court specifically found that Warren had no written contingency fee contract with Guardian or Ward before May 11, 2001,[32] the trial court also expressly found Warren "did not obtain a signed contingency contract with [Guardian] until *after he had commenced representation.*"[33] The trial court found that "[o]n or about March 26,

---

**29.** R. at 31, Exhibit (C) 4–8.

**30.** He contacted one by letter. He testified on cross-examination that he contacted the other two by phone.

**31.** R. at 232, ¶ 6.

**32.** R. at 232, ¶ 8.

**33.** R. at 235, ¶ 21 (emphasis added).

2001," Warren "agreed to accept service of the MetLife suit on behalf of Ward."[34] According to the appellate record, Wentworth's answer and affirmative defenses were filed in the MetLife case on or after April 30, 2001.[35] The trial court also found that on May 4, 2001, Warren was informed there would be a conference call with the federal judge in the MetLife case on May 8, 2001.[36] The court further found Warren hired local counsel in Pennsylvania to file the pleadings and other matters drafted by Warren.[37]

¶ 48 On May 11, when Guardian came to his office to sign the contingency fee contract, Warren testified he told Guardian a settlement conference had been scheduled and depositions were scheduled for several days in August 2001. Given Wentworth's answer and affirmative defenses, Warren testified he had the impression Wentworth intended to pursue the matter and settlement possibilities were low.

¶ 49 On May 25, 2001, Guardian's answer, including affirmative defenses, was filed by local counsel. Warren testified he had prepared that pleading but was not yet admitted to practice in the federal court, so it was signed by local counsel. The record reflects Warren also prepared a settlement offer letter to Wentworth, dated May 30, 2001, in which he detailed the guardianship and other circumstances involving Ward.

¶ 50 Warren testified that Wentworth did not respond to his settlement offer and the settlement conference, originally scheduled for June 19, 2001, was continued to July 19, 2001. Thereafter, Warren sent another letter to Wentworth dated July 18, 2001, withdrawing the May 30 settlement offer and proposing an offer of $207,000 less $59,300 that had already been paid to Wentworth at a monthly payment of $1,500 until paid.

¶ 51 Though, as previously discussed herein, the trial court found the settlement conference did not rise to the level of a hearing

contemplated by the contingent fee contract, Warren testified he believed he was required to be prepared for a "mini-trial" at the settlement conference and he prepared to that degree.

¶ 52 Based, then, on the trial court's findings and the record on appeal, Warren was representing Guardian on Ward's behalf prior to execution of the written contingency fee contract on May 11, 2001. Further, though Warren testified he charged no fee for the services he provided at various times in 1998 and 1999, prior to his acceptance of service in the MetLife interpleader action in March 2001, the trial court specifically found the action he took during that period was on behalf of Ward.[38]

¶ 53 Regarding the contingent fee contract, the trial court expressly found there was no fraud or undue influence in the procurement of that contract.[39] The court further stated, "A contingency fee contract may have been proper in this matter because [Guardian] and [Ward] did not have ample resources to pay an hourly rate considering the potential time that was anticipated by [Warren] in handling the matter." The trial court also did not believe Warren "hurriedly obtained a contingency fee contract because he knew the case was for sure going to settle." The court found the evidence was lacking that Warren "knew of some precedential case holding before the contingency contract was signed," specifically referencing the testimony of an attorney who assisted Warren with electronic research in June 2001.

¶ 54 In addition, the trial court found that after the MetLife case settled, Guardian and Warren "agreed to a distribution of future payments to satisfy the fee."[40] Guardian admitted on cross-examination that she signed Petitioner's Exhibit 15, a document setting out the amount of money Warren would be paid each month for his attorney

**34.** R. at 232, ¶ 6.

**35.** R. at 109. The document in the record is not file-stamped, but is dated April 30, 2001.

**36.** R. at 232, ¶ 7.

**37.** R. at 232, ¶ 6.

**38.** R. at 232, ¶ 6.

**39.** R. at 235, ¶ 21.

**40.** R. at 233, ¶ 10.

fee in the total amount of $167,387.20. She stated the division of the annuity—prepared by Ward in Petitioner's Exhibit 14, and represented in Petitioner's Exhibit 15—was a fair calculation and division of the settlement. Ward's testimony corroborated Guardian's testimony that, although declared incompetent, he took an active role in preparing the schedule of payments to Warren, even testifying that Warren was supposed to receive $800 per month until his fee was paid. In accord with their agreement, the uncontroverted evidence revealed that, in partial performance of the contingency fee contract, Guardian paid Warren his attorney's fee every month, or other time of distribution, for nearly five years from the funds MetLife distributed to Ward's estate from the structured settlement. Guardian testified she was satisfied with the settlement in 2001 through the first half of 2005. The last payment Guardian made to Warren followed the last payment made to Wentworth under the terms of the settlement agreement. The trial court found Warren had been paid $98,890.71 under the terms of that agreement.[41]

¶ 55 Also, bearing upon the appraisement of Warren's employment is "his skill, diligence, and the final results in the litigation[.]" *Bassett,* ¶ 23. The trial court specifically found "[t]he amount involved in the litigation and the savings realized [were] significant to [Ward] and [Ward's] estate. Even though there was a risk of non-recovery, [Warren] achieved a successful result."[42] The court further found "[t]he questions presented were novel and difficult and imposed time limitations on" Warren. Further, these findings, as well as the previous findings discussed herein, comport with the Rule 1.5 factors discussed in the case law to be considered in the court's determination of a reasonable fee.

¶ 56 Given the foregoing findings of the trial court and the attendant circumstances in the record on appeal, and given, in particular, Guardian's partial performance of the agreed payment schedule for Warren's fees for nearly five years, we reject Guardian's argument that Warren should be awarded no attorney's fee and conclude Warren's fee should be fixed at the amount he has already been paid; that is, $98,890.71.[43]

## CONCLUSION

¶ 57 Inasmuch as this case is grounded in equity, we conclude the trial court did not abuse its discretion in refusing to approve the contingent fee contract for the reason that the 40% contingency was excessive and, thus, unreasonable. Evidence in the record supports that determination. We also conclude the trial court correctly determined that quantum meruit is the proper measure for fixing the value of Warren's services; however, we conclude the trial court abused its discretion in fixing only a 10% attorney's fee award in light of the trial court's findings and other attendant circumstances present in the appellate record. The only "percentage" evidence presented was Warren's evidence that a 40% fee was reasonable. In accord with this Court's equitable power and after consideration of the trial court's findings, including its findings that most of the Rule 1.5 factors were present in this case, and of the attendant circumstances presented in the record, we conclude the trial court should have approved an attorney's fee to Warren in the amount of $98,890.71, the amount he has already been paid. Accordingly, we affirm the trial court's Judgment disapproving Warren's 40% contingent fee and affirm the award of costs and an attorney's fee determined in quantum meruit, but modify the Judgment fixing the fee in an amount equal to 10% of the savings to Ward's estate by

41. R. at 233, ¶ 10.

42. R. at 237, ¶ 27.

43. While the trial court's determination that an award of 40% of the savings to Ward's estate was excessive finds support in the record, no evidence was presented that 10% was equitable. Guardian admitted she knew very little about the work Warren did before and after he went to the settlement conference. She testified she did not think he did "that much," but admitted she did not know. The only evidence before the trial court regarding a "percentage" was Dawson's testimony that a 40% contingency fee was reasonable for the work Warren did.

increasing that award to $98,890.71.[44]

¶58 **AFFIRMED AS MODIFIED.**

GOODMAN, J., concurs, and WISEMAN, P.J., concurs in part, dissents in part.

WISEMAN, P.J., concurring in part and dissenting in part.

¶1 For the reasons enumerated below, I would affirm the trial court's order without modification. I concur with the Majority that the trial court was correct in denying Warren's request to approve the contingency fee contract as being unreasonable, whether the percentage was 33⅓ or 40%. From the description in the record, this settlement conference does not appear any more rigorous than any other settlement conference in federal court, where one must be prepared to summarize the evidence and argue the law to the settlement judge to effect the most positive settlement terms for one's client. The evidence does not support finding this settlement conference to be the equivalent, either in substance or procedure, of an evidentiary hearing or trial, as contemplated by the contract, particularly when the judge merely told the parties to go outside and settle the case. I also agree that there is no basis on which to deny Warren a fee altogether, and the trial court correctly denied Guardian's request to do so.

¶2 After reviewing the circumstances here, however, I part company with the Majority when it concludes that the fee of almost $99,000 that Warren has received is reasonable (and therefore equitable). The record establishes the following:

1. Warren began work on the matter for which he seeks compensation of $175,000 in fees and expenses in late March 2001 when MetLife contacted him about accepting service in the interpleader case. As the Majority notes, Warren admitted in his testimony that he charged no fee for services related to this matter rendered before his acceptance of service in the interpleader case in late March 2001.

2. On May 8, 2001, Judge Weiner, in a conference call with all counsel, set the case for settlement conference in Philadelphia on June 19, 2001, which was later reset for July 19, 2001.

3. The case was settled that evening after the settlement conference and on exactly the terms Warren proposed in his letter to Wentworth the day before the settlement conference, July 18, 2001.

4. Warren states that Guardian agreed verbally to a contingent fee arrangement in late April or early May 2001. The written fee agreement was entered into on May 11, 2001. Although events transpired over a 4-month period (March to July 2001), it appears that most of the work, and certainly almost all of the substantive work, occurred over the 2-2½ month period from May to July 2001.[1]

5. If Warren's reasonable fee award is $99,000, this represents a fee of $25,000 a month for four months' work.

6. Repeatedly denying having any time records, Warren produced none, and he completely failed, using documents or otherwise, to estimate or reconstruct his time for this relatively short period of representation, or for any of his representation of Guardian or Ward. He offered no evidence on the time or labor required to perform the services he rendered. Warren argues on appeal that although the "hours

---

44. Warren requested "an award of appellate costs and attorney fees in this case" without a separately filed and labeled motion and without citation to the statutory or decisional authority allowing the attorney's fee as required by Oklahoma Supreme Court Rule 1.14, 12 O.S.2011 & Supp.2013, ch. 15, app. 1. We deny Warren's request.

1. The Majority appears to try to extend this period of representation back to 1998 which the record does not support, because Warren himself testified that either he was not representing Guardian and Ward or he did not charge them for that work and that he did not bill them because he was "trying to help [Guardian and Ward] out on this case because [Warren] knew they had that judgment against them for $572,000." August 29, 2012, Tr. at 174, 177–178, and 182. The only position supported by the record is that the fee being pursued in this appeal is for representation from March 2001 to the conclusion of the case.

spent" criterion in *State ex rel. Burk v. City of Oklahoma City*, 1979 OK 115, 598 P.2d 659, applies in this case, it is "but one of twelve criteria."

7. It appears that the work performed consists essentially of drafting Guardian's answer, correspondence to other counsel, some phone calls with counsel, the court, and the client, the Philadelphia settlement conference, and paperwork to conclude the settlement.

8. Warren also presented no evidence regarding the skill required to perform the legal services properly, the likelihood of preclusion of other employment by this representation, or fees awarded in similar cases.

9. Warren offered no evidence regarding his hourly rate.

10. Local counsel in the Philadelphia federal case charged at the rate of $150 an hour and received $2,500 for his services in the case.[2]

¶3 Based on these circumstances, I conclude the following legal precepts apply:

1. As noted by the Majority, the trial court has broad, equitable powers to review contingent fee contracts executed by a guardian on behalf of a ward. *See In re Guardianship of Stanfield*, 2012 OK 8, 276 P.3d 989.

2. Because the trial court enjoys such broad powers of equity, its decision may not be reversed or modified unless the decision is shown to have been the result of an abuse of that broad discretion, that is, when the decision is "clearly contrary to the weight of the evidence or to some governing principle of equity jurisprudence." *Hedges v. Hedges*, 2002 OK 92, ¶ 10, 66 P.3d 364.

3. It is widely accepted that the trial court is in a much better position to judge the credibility of the witnesses and the weight to be given their testimony than the appellate court which does not have the benefit of that firsthand view and must rely on the cold record. This is an instance, for that reason, where the trial court's decision should be given the appropriate deference. "When the evidence, as here, is conflicting, we defer to the judgment of the trial court, which is in the best position to observe the behavior and demeanor of the witnesses and to judge their credibility." *Parnell v. Parnell*, 2010 OK CIV APP 74, ¶ 11, 239 P.3d 216; *see also Mueggenborg v. Walling*, 1992 OK 121, ¶ 7, 836 P.2d 112; *Brown v. Brown*, 1993 OK CIV APP 142, ¶ 3, 867 P.2d 477.

4. Warren may not escape his burden to provide the court with baseline evidence of his time and hourly rate by refusing to do so and then object when the fee is lowered.

5. The cases cited by the Majority regarding the application of the factors in *Burk* and Rule 1.5 of the Rules of Professional Conduct, 5 O.S.2011, ch. 1, app. 3–A, require this Court to state affirmatively that these factors apply in determining the amount of a reasonable attorney fee for services rendered to this Guardian and Ward.

6. The nature of the relief sought demands discussion by the Majority of the relationship between the factors in *Burk* and Rule 1.5 and the concept of *quantum meruit*. Is quantum meruit simply the amount of time reasonably necessary to perform the services multiplied by the reasonable hourly rate, or is it that lodestar calculation plus consideration of the other *Burk* and Rule 1.5 factors? In *Sneed v. Sneed*, 1984 OK 22, ¶ 5, 681 P.2d 754, the Oklahoma Supreme Court states: "The hourly rates of compensation should be determined; then an additional attorney fee should be based on the following criteria: [the 12 *Burk* factors]." (footnote omitted).

7. The fact that the resulting reasonable fee as calculated by the trial court ($41,847) will require the attorney to refund part of his fee as excessive cannot be given consideration in deter-

2. Petitioner's Exhibits 47 and 49.

mining what is equitable for the Guardian and Ward.

¶ 4 Based on the foregoing, I respectfully dissent from the Majority's view that the award must be modified to reflect that the trial court should have awarded the amount that Warren has been paid, nearly $99,000. The Majority states that "no evidence was presented that 10% was equitable" as awarded by the trial court. If this is so, there is likewise no evidence that $99,000 represents the reasonable value of Warren's services (*quantum meruit*) and is therefore an equitable fee.

¶ 5 The trial court's well-reasoned and well-founded determination as to this contested attorney fee was neither clearly against the weight of the evidence nor contrary to established equitable principles, and I would affirm its decision without modification. I therefore concur with the Majority in part and dissent in part.